UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY ) <br> COMMISSION, ) <br>  ) <br> Plaintiff, ) <br>  ) <br> vs. ) <br>  ) <br> RMG COMMUNICATIONS, LLC d/b/a ) <br> BLOOM MARKETING GROUP, ) <br>  ) <br> Defendant. ) | Cause No. 1:08-cv-947-WTL-TAB |

### ENTRY ON MOTION FOR PARTIAL SUMMARY JUDGMENT

This cause is before the Court on Defendant's Motion for Partial Summary Judgment (Docket No. 26).  The motion is fully briefed, and the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

### I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the admissible evidence presented by the nonmoving party must be believed and all reasonable inferences must be drawn in the nonmovant's favor.  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007);

*see also* Fed. R. Civ. P. 56(e)(2).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Methodist Medical Center of Illinois v. American Medical Security, Inc.*, 38 F.3d 316, 319 (7th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The non-moving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Wolf v. Northwestern Indiana Symphony Society*, 250 F.3d 1136, 1141 (7th Cir. 2001), *cert. denied*, 534 U.S. 1028 (2001).  "[T]he court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

In evaluating a motion for summary judgment, although the court draws all reasonable inferences from undisputed facts in favor of the nonmoving party and views the disputed evidence in the light most favorable to the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *Pugh v. City of Attica, Indiana*, 259 F.3d 619, 625 (7th Cir. 2001).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute; "instead, the nonmoving party must present definitely, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).  "If the nonmoving party fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment as a matter of law because 'a complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial.'" *Lewis v. Holsum of*

*Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## II.  BACKGROUND

Plaintiff Equal Employment Opportunity Commission ("EEOC") alleges that Defendant RMG Communications, LLC d/b/a Bloom Marketing Group ("Bloom") committed employment discrimination against Bonita Lucas based on her race and disability.

The facts taken in the light most favorable to the non-moving party, the EEOC, are that Lucas, who is African-American, suffers from insulin-dependent diabetes.  Although she monitors her blood sugar and takes insulin injections twice a day, Lucas occasionally suffers from diabetes-related complications.  Approximately three times per week Lucas experiences hypoglycemic episodes when her blood sugar drops.  The physical manifestations of a hypoglycemic episode are usually dizziness, sweating, slurred speech, confusion, and sleepiness.  Lucas is often able to curtail an episode by eating or drinking.  However, occasionally she is unable to do so.  To inform others that she is diabetic, Lucas wears a medical alert bracelet that indicates her condition.  Lucas wears the bracelet at all times, and it is always visible as she does not wear long sleeves.

In February 2007, Lucas was hired by Bloom as a marketing associate.  As part of her employment application Lucas was asked for, and provided Bloom with, information about medical conditions.  Lucas indicated that she was an insulin-dependent diabetic.  Only nine days after being hired Lucas suffered a hypoglycemic episode at work, which gave rise to this litigation.

On February 16, 2007, Lucas arrived at work at her normal time.  At approximately 2:30

p.m. an ambulance was called for one of Lucas's co-workers, Elva "Dee Dee" Haynes, who was experiencing shortness of breath. Haynes declined the ambulance and remained at work. Shortly thereafter, between 3:00 and 4:00 p.m., Lucas began to have a hypoglycemic episode. She began to perspire heavily and fell asleep. Lucas's supervisor, Ignacio Cuadra, woke her up. Lucas told Cuadra that she was not sleeping but was, instead, ill. When Cuadra returned to Lucas's desk a second time and found her dazed, apparently sleeping, and disoriented, he escorted her to human resources.

In the human resources office, Human Resources Supervisor Kelsey Keag asked Lucas why she kept falling asleep. Lucas responded that she was having a hypoglycemic episode and was ill. Keag's notes from that day confirm that Lucas stated "that her blood sugar was low." After a discussion with Cuadra out of Lucas's earshot, Keag informed Lucas that she would have to go for drug testing. Lucas was given permission to go to the break room before leaving for the drug test. She purchased chips and a soda, which she began to consume immediately. Before she finished her food, recruiting specialist Amber Sigman came to escort Lucas to her drug test.

At the clinic Lucas began to feel better. She provided a urine sample for the drug test and then returned to the waiting room where Keag and Sigman had remained. Lucas told Keag that she was still not feeling well and was going to be done for the day. She gave Keag her temporary identification card, which she had to turn in at the end of every work day to avoid a fine. Lucas then returned to the bathroom to retrieve her purse and jacket. When she went back to the waiting room Keag and Sigman were gone.

The following Monday, February 19, 2007, Lucas called Keag and asked if she could

return to work. Keag said that she did not yet have the results of the drug screen and would contact Lucas when they were available. On Tuesday, February 20, 2007, Keag called Lucas and told her that her drug test was negative. Lucas asked if she could return to work. Keag replied that she had assumed that Lucas had quit and her employment had been teriminated.

### III.  DISCUSSION

In its Complaint, the EEOC brings suit under Title VII of the Civil Rights Act of 1964, Title I of the Americans with Disabilities Act of 1990, and Title I of the Civil Rights Act of 1991. The EEOC alleges that Bloom committed race and disability discrimination against Lucas. Because the EEOC claims that Bloom acted with malice or reckless indifference to Lucas's rights, the EEOC is seeking punitive damages.

    **A.**    **Punitive damages standard.**

Punitive damages are available under the Civil Rights Act of 1991 "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) (2006). The Supreme Court interpreted the statute in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999), and noted:

> The very structure of § 1981a suggests a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination . . . . Congress plainly sought to impose two standards of liability – one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award.

The Court continued and emphasized that in order to be subject to punitive damages "[t]he employer must act with 'malice or with reckless indifference to the [plaintiff's] federally protected rights.' The terms 'malice' or 'reckless indifference' pertain to the employer's

5

knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535 (citation omitted). Thus, "in the context of § 1981a, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536.

The Seventh Circuit has set out a three-part test that the court uses to determine when punitive damages are proper under the statutory standard. In *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001) (citation omitted) the court stated that first "a plaintiff must . . . demonstrate that the employer acted with the requisite mental state. The employer must have acted with knowledge that its actions may have violated federal law." A plaintiff satisfies this element by

> demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws. A plaintiff may also establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions.

*Id.* at 858. If a plaintiff satisfies the first element then he or she must next "establish a basis for imputing liability to the employer." *Id.*

Even if the plaintiff establishes the first two elements of the *Bruso* test "the employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy." *Id.* Thus, the third prong of *Bruso* may serve as a defense for the employer. However, "the implementation of a written or formal antidiscrimination policy . . . is not sufficient in and of itself to insulate an employer from a punitive damages award." *Id.* Instead, the employer must show that it engaged in good faith efforts to establish and enforce an antidiscrimination policy in compliance with Title VII and the

ADA. *See Kolstad*, 527 U.S. at 544.

### B. Application.

#### 1. The mental state.

In order to establish the first prong of *Bruso*, the EEOC must show that Keag and Shepley were "familiar with the antidiscrimination laws and the employer's policies for implementing those laws." *Bruso*, 239 F.3d at 858. In *Bruso*, the Seventh Circuit found that the plaintiff established this requirement by showing that the plaintiff's supervisor "admitted . . . that he . . . had discussed United's zero-tolerance policy with every supervisor 'on more than one occasion.'" *Id*. at 859. Additionally, individuals further up the chain of command testified that they had read the company's zero-tolerance policy and informational materials, had attended more than one training session on sexual harassment, and were responsible for "educating and training United's employees about Title VII and United's antidiscrimination policies." *Id*. at 860. The court concluded that based on this evidence, a reasonable jury could find that Bruso's supervisors were familiar with Title VII and were aware that their actions against Bruso could violate federal law.

Similarly, in *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 662 (7th Cir. 2001), the court found the first *Bruso* element satisfied when the plaintiff's supervisor testified that "SRAM had a sexual harassment policy and . . . he believed [the policy] required an investigation and an attempt to reach a resolution between the parties." The supervisor stated that after receiving a complaint from Hertzberg he spoke with the alleged harasser, told him that his actions were inappropriate, and stated "that he should stop doing that immediately [because] [i]t was incorrect behavior in the workplace." *Id*. Because a reasonable jury could have found that the individual

decisionmakers were aware of the antiharassment policy and failed to take action to protect Hertzberg's federal rights, the first element was satisfied. *Id*. at 662-63.

In the instant case, Keag acknowledged that she was an HR Supervisor, which meant that she was "responsible for overseeing the human resource efforts at Bloom Marketing Group." (Keag Dep. at 12). This included "overseeing the hiring process and employee relations and dealing with employee issues on the floor and supporting human resources training." *Id*. Keag also "maintained an open door policy" to deal with employee issues, worked with other human resource staff members to train Bloom employees, and worked on "putting together comprehensive training regarding employee relations, harassment training." (Keag Dep. at 13). At Bloom, Keag received EEO instruction. (Keag Dep. at 15, 20). She testified that as a result of this training, if there was a workplace harassment claim made then she would "conduct a discreet investigation to try to determine what the harassment situation was." (Keag Dep. at 22). If, after conducting the investigation, an intervention was necessary, Keag and other managers would take corrective action. *Id*. Thus, Keag was familiar both with the antidiscrimination laws and with Bloom's policies implementing those laws.

However, when the dazed and disoriented Lucas presented in Keag's office and stated that she was having a hypoglycemic reaction, Keag decided to send her for drug testing. Keag made this decision <u>after</u> Lucas stated that she was ill and was having a low blood sugar reaction. (Keag Dep. at 62-64). Keag's notes from that day clearly indicate that Lucas "stated that her blood sugar was low." (Keag Dep. at 64). Despite her knowledge of the antidiscrimination laws and Bloom's implementation of these laws, Keag insisted that Lucas submit to a drug test.

Like Keag, Vice President of Human Resources Katherine Shepley testified that she was

familiar with Bloom's employee handbook, aware of the open door policy, and cognizant of the complaint process following any incidence of harassment. (Shepley Dep. at 32-34). She also testified that she helped draft portions of Bloom's employee handbook. (Shepley Dep. at 33). Shepley has "had a variety of human resources workshops, including EEO training, over [her] human resources career." (Shepley Dep. at 42). As with Keag, this undisputed evidence indicates that Shepley was aware of the antidiscrimination laws and with Bloom's policies implementing those laws. Nevertheless, Shepley supported Keag's decision to send Lucas for drug testing.

Keag and Shepley were familiar with the antidiscrimination laws and with Bloom's antiharassment policy implementing these laws, yet they insisted that Lucas, a known diabetic who stated that she was experiencing a low blood sugar episode, go for drug testing. Based on these facts, the first *Bruso* element is satisfied.

### 2. Imputing liability.

In the instant case, Bloom does not dispute that Keag and Shepley were managerial agents. Thus, the second prong of the *Bruso* test is established.

### 3. Good faith defense.

Having found both the first and second *Bruso* elements satisfied, the Court now turns to the third element, which may serve as a defense for Bloom. Bloom can avoid punitive damage liability if it can show that it engaged in good faith efforts to implement an antidiscrimination policy. *Bruso*, 239 F.3d at 858. This requires that Bloom show that it engaged in good faith efforts to establish and enforce an antidiscrimination policy in compliance with Title VII and the ADA. *See Kolstad*, 527 U.S. at 544.

Unfortunately there is little guidance as to what constitutes "good faith efforts." In *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483 (7th Cir. 2003), the Seventh Circuit determined that the good faith defense did not apply because there was evidence that the defendant-employer had altered employment records to discredit the plaintiff. Relying on *Bruso*, the court stated that "evidence of a sham investigation designed to discredit the plaintiff" and a cover-up was enough to properly place the issue of punitive damages before the jury. *Id.*

Bloom cites *Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153, 172 (D. Md. 2000), as an example of a court finding good faith efforts to implement an antidiscrimination policy. In *Jaudon* the plaintiff claimed that she was sexually harassed at work and then fired in retaliation for reporting the sexual harassment. *Id.* at 156. The court stated that "the record clearly establishes that Elder Health published, maintained, and distributed sexual harassment, open door, and equal opportunity policies." *Id.* at 172. Thus, summary judgment on the plaintiff's punitive damage claim was appropriate. *Id.* at 173; *see also Ridley v. Costco Wholesale Corp.*, 217 Fed. Appx. 130, 138 (3d Cir. 2007) (declining to impose punitive damages when the evidence showed that "Costco maintained policies against discrimination and harassment and an Open Door policy for reporting complaints of discrimination or harassment," "trained new supervisors with respect to Costco's harassment complaint policy," and "provided supervisors with detailed materials regarding the supervisor's obligation to address discrimination issues.").

In response, the EEOC relies on *EEOC v. Preferred Management Corp.*, 226 F. Supp. 2d 957 (S.D. Ind. 2002). In *Preferred Management*, the EEOC brought suit on behalf of a group of current and former employees and alleged religious discrimination in violation of Title VII. The jury awarded punitive damages. In upholding the jury's punitive damage award, the court

emphasized that Preferred Management did not make good faith efforts to implement an antidiscrimination policy.  "Preferred had no anti-harassment policy concerning religion and . . . no management personnel had any training, or conducted any training, in religious discrimination or harassment."  *Id*. at 963.  Because the jury could reasonably have concluded that Preferred Management "had a callous disregard for the religious views of those who disagreed with them," punitive damages were appropriate.  *Id*. at 964.

It is undisputed that Bloom provided all employees with a copy of its Call Center Handbook, which contains information about Bloom's anti-discrimination and equal employment opportunity policy.  This handbook contains a harassment policy which states:  "We will not tolerate or condone any type of harassment based on sex, race, color, religion, national origin, age, disability, or any classification protected under federal, state, or local law."  (Sheply Aff. at 7).  The policy continues and avers that any person found guilty of "any form of harassment will be subject to discipline, up to and including termination."  *Id.*  Defendant's handbook also includes a complaint policy, substance abuse policy, equal employment opportunity policy, health examination and drug screening policy, and an open door policy.  (Shepley Aff. at 7-10, 29-30, 35).

However, despite Bloom's assertion that it engaged in good faith efforts to establish and enforce an antidiscrimination policy in compliance with Title VII and the ADA, noticeably absent from Bloom's handbook are policies specific to race or disability discrimination.  Furthermore, there is no evidence of record that demonstrates that Bloom provided employee training on race or disability discrimination.  (Keag Dep. at 20-21).  Based on the record before it, the Court cannot determine as a matter of law whether Bloom engaged in good faith efforts to

11

establish and enforce an antidiscrimination policy. Thereofre, Bloom is not entitled to summary judgment on the punitive damages issue.

## CONCLUSION

Accordingly, for the reasons stated herein, Defendant's Partial Motion for Summary Judgment (Docket No. 26) is **DENIED**.

SO ORDERED: 10/27/2009

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to:

Michelle Eisele
Equal Employment Opportunity Commission
michelle.eisele@eeoc.gov

Jo Ann Farnsworth
Equal Employment Opportunity Commission
joann.farnsworth@eeoc.gov

Geoffrey Mitchell Grodner
Mallor Clendening Grodner & Bohrer
gmgrodne@mcgb.com

Lonnie D. Johnson
Mallor Clendening Grodner & Bohrer
ljohnson@mcgb.com

Aarika D. Mack-Brown
Equal Employment Opportunity Commission
aarika.mack-brown@eeoc.gov

Janice L. Sterling
Mallor Clendening Grodner & Bohrer
jsterling@mcgb.com

Laurie A. Young

Equal Employment Opportunity Commission
legal.station@eeoc.gov